IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>600 Second Avenue SW Room #358,<br>South Charleston, West Virginia, 25303 | Case Nos.<br><br>2:23-MJ-00133<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Brandon S. Holestine, Postal Inspector, United States Postal Inspection Service (hereinafter "USPIS"), Charleston, West Virginia Domicile, also hereinafter referred to as the "Affiant," being first duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  Your affiant is an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 3061.

2.  I am a Postal Inspector, employed by the USPIS since April of 2017, and currently assigned to the Charleston, West Virginia Domicile. I am a sworn Federal Law Enforcement Officer empowered to investigate criminal activity involving or relating to the United States Postal Service (hereinafter "USPS") and U.S. Mail. I am currently assigned to investigate matters that involve the mailing of illegal narcotics, dangerous drugs, and their proceeds. I have received training in the detection and investigation of prohibited mailing offenses. Prior to my assignment in the Charleston, West Virginia Domicile, I was assigned to the USPIS Cleveland, Ohio field office

1

where I also conducted investigations involving mailing of illegal narcotics, dangerous drugs, and their proceeds, and was assigned as a task force agent with the U.S. Drug Enforcement Administration.

3.   I have received training in the detection and investigation of prohibited mailing offenses during a residential Basic Inspector Training program in Potomac, Maryland. I have also received training in financial investigations as they relate to drug trafficking organizations, firearms trafficking organizations, money laundering, and asset forfeiture. I have received field training and participated in many aspects of USPIS prohibited mailing investigations, including but not limited to: parcel interdiction, surveillance, controlled deliveries, execution of search warrants, interview and interrogation, confidential source/cooperating witness debriefing, and interception and analysis of electronic communications. I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. I am familiar with drug traffickers' methods of operation, especially as they relate to the Postal Service, including the storage, transportation, and distribution of drugs, the transfer and collection of money which represents the proceeds of drug trafficking, and money laundering.

4.   I know from my training and experience that the U.S. Mail is often used by drugs traffickers to transport controlled substances. I further know that the Priority Mail system is commonly used to transport controlled substances because this system provides reliability, traceability, and timely delivery.

5.   I know that the success of professional Drug Trafficking Organizations (DTOs) depends upon maintaining extensive contacts throughout the country and internationally. Specifically, individuals involved in drug trafficking must maintain contact with drug suppliers, drug couriers, drug customers, and others involved in the supply, transportation, distribution, sales, and marketing of controlled substances. The use of cellular telephone communication is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain, to include local traffickers.

6.   As a Postal Inspector and as a task force agent with the DEA, your affiant has participated in many aspects of drug investigations including conducting physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, and participating in investigations involving the interception of wire communications, body recordings, and video surveillance. Your affiant has also participated in and executed numerous search-and-seizure warrants authorizing the search of real property and vehicles used by drug traffickers.  Materials searched for and recovered have included controlled substances, packaging materials, scales, cutting agents, weapons, documents, papers, electronic files and other media, receipts for concealed investments, and proceeds derived from the distribution of controlled substances.

7.   Your affiant is familiar with the methods that drug traffickers use to conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of mobile telephones, computers and other electronic devices, their use of businesses, houses, and other facilities in which controlled substances are stored and meetings are conducted, and their use of numeric codes and code words to conduct their drug transactions.  Your affiant is also familiar with drug traffickers' use of communications devices, and texting applications and programs on such devices to conduct their business, including, but not limited to, transmitting information regarding price, quantity, and transportation of controlled substances.

8.   Based on your affiant's training, experience and participation in narcotics and drug related investigations and the training and experience of other Agents and Task Force Officers with whom I am working closely in this investigation, your affiant knows:

      a.      That drug trafficking on a scale described herein is an economic crime based on the profits to be earned. Large-scale narcotics traffickers often maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing drug business.

      b.      That persons engaged in drug trafficking commonly conceal controlled substances, currency, financial instruments, precious metals, jewelry, titles to automobiles, and other items of value in their residences, businesses, and automobiles.

      c.      That when drug traffickers amass large proceeds from the sale of drugs, they attempt to legitimize profits through various money laundering techniques such as the placing of assets in nominee names, use of legitimate and sham/shell businesses, use of financial institutions, use of wire transmitters, and numerous other techniques. In this regard, drug traffickers often use domestic and foreign banks and/or financial institutions and their attendant services, securities, safe deposit boxes, cashier's checks, drafts, letters of credit, brokerage houses, real estate, "shell" corporations and businesses as "fronts" for their proceeds.

      d.      That narcotics traffickers purchase assets with the proceeds of their unlawful activity and often place these assets in nominee names. Oftentimes, drug dealers place these assets in names of relatives, close acquaintances, or business entities to avoid detection and seizure of the assets by government agencies.

e.      That it is essential that members of drug distribution operations maintain contact with one another and use expedited means of communication to facilitate their criminal conduct.  To accomplish this, continued access to telephone and/or electronic mail (E-mail) communications is necessary.  The use of cellular telephones (traditional, pre-paid, and push-to-talk or direct connect) and text messaging and email electronic devices such as computers, tablets, iPads, and smartphones, are crucial to the success of drug traffickers in maintaining timely long-distance and local contacts with suppliers down the organizational chain to local traffickers and/or customers.   These electronic devices, with video/photographic capabilities and vast storage capacity, allow individuals who deal in illegal controlled substances to not only maintain written or electronically stored entries which reflect names, addresses and/or telephone numbers for their current and past associates in drug trafficking (even if said items may be in code) but also many other aspects of criminal activity.

f.      That drug traffickers commonly "front" (provide on consignment) drugs to their customers, and frequently maintain records of same.

g.      That safes and/or concealed compartments are often used as locations to store drugs, currency, assets, and other proceeds and evidence of drug trafficking.

h.      That after purchasing controlled substances, traffickers will often transport, or have transported, the controlled substances to areas where they will distribute the controlled substances. Methods of transportation include but are not limited to commercial airlines, private aircraft, boats and ocean-going vessels, rental and private automobiles, government and contract mail/parcel carriers.

i.      That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them.  Such records also can be stored in electronic computer, tablet and/or smartphone memory media.

j.      That drug traffickers often take, or cause to be taken, photographs or videos of themselves, their associates, their property and assets, and their product, and these items are usually maintained in their residences.  Such items also can be stored in electronic computer, tablet and smartphone memory media.

k.      That drug traffickers often keep readily available the paraphernalia for packaging, cutting, weighing, and distributing controlled substances. These items include, but are not limited to scales, plastic bags, and heat sealers.

l.      That drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes, but is not limited to, digital display pagers (beepers), cellular telephones, speed dialers, electronic telephone and date books, money

counters, fax machines, police scanners and devices such as computers, "tablets," iPads, and smartphones.

m.     That drug traffickers commonly have in their possession, that is, on their person, at their residences, in their automobiles, and their businesses, firearms and ammunition, among other weapons. These firearms are used to protect and secure a drug trafficker's person and property.

n.     That drug smugglers using the U.S. Mail or other package delivery services often use fictitious names or names of others not closely associated with them so as to conceal their identity.

o.     It is common for drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, the residences of their associates, and residences of family members for ready access and to conceal them from law enforcement.

p.     Persons engaged in drug trafficking often times conceal in their residences and stash houses: drugs, scales, blenders, baggies, cutting agents, large amounts of cash, money counters, and other items used in preparing, packaging, selling and transporting narcotics

q.     Individuals involved in kilogram quantities of narcotics trafficking are commonly involved in bulk U.S. currency transfers in which the illegal drug proceeds are passed from the drug trafficker to a member of the drug trafficking organization in the source area, who facilitates the transfer of currency to the drug cartel or supplier, who are typically located in border states such as California, Texas, Arizona, New York, New Jersey, Puerto Rico, Michigan, Oregon, Washington, or are outside the United States, and in return the narcotics are then shipped or delivered to the local drug trafficker.

9.   The information in this affidavit is based in part on personal knowledge derived from the participation of your affiant and other law enforcement officers in this investigation and, in part, upon information provided by sources, surveillance by law enforcement, as well as other investigative activity. The information in this affidavit is provided for the limited purpose of establishing probable cause in connection with an application for a search and seizure warrant. The information is not a complete statement of all the facts relating to this investigation.

10. Pursuant to 21 U.S.C. §841(a)(1), it is a federal crime to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, namely methamphetamine.

11. Pursuant 21 U.S.C. §843(b), it is a federal crime to knowingly or intentionally use any communication facility, such as the U.S. Mail System, in committing or in causing or facilitating the commission of any act of drug trafficking. Similarly, conspiring to violate this section is also a felony.

12. The offenses set forth in paragraphs 10 and 11, which describe violations of 21 U.S.C. §841(a)(1)- Possession with the Attempt to Distribute a Controlled Substance and Conspiracy to Attempt to Possess a Controlled Substance with the Intent to Distribute a Controlled Substance, 21 U.S.C. §843(b)- Use of a Communications Facility in furtherance of a violation of 21 USC §841(a)(1), will be collectively referred to as the "Target Offenses."

13. Based on the facts set forth in this affidavit, there is probable cause to believe that evidence that will aid in the prosecution of violations of the Target Offenses will be located inside the location identified herein.

**TARGET PREMISES**

14.  **Room 358 of the Microtel Inn & Suites, 600 Second Avenue SW, South Charleston, West Virginia 25303** ("Target Premises") is located within the city limits of South Charleston in Kanawha County, West Virginia, and within the Southern District of West Virginia. The Target Premises is located within the multi-unit hotel known as the Microtel Inn & Suites. Room 358 is further described as a single room with two (2) beds and an adjoining bathroom. Room 358 is located on the 3rd floor of the Microtel Inn & Suites and is located approximately 50 feet from the elevator. The room number "358" is clearly marked to the left side of the door.

7

**PROBABLE CAUSE**

15. On July 16, 2023, while reviewing USPS electronic records relating to shipments of parcels to the Southern District of West Virginia from known source states, such as New York, Postal Inspectors identified USPS Priority Mail Express package bearing tracking number "EI 518 780 932 US" with a return address of "William Rosenberg 164 Smith St Merrick N.Y 11566" and a delivery address of "Jason Painter 161 Cromwell Estates Rd Clendenin, W.V 25045" (SUBJECT PARCEL). Based on his training and experience, your affiant believed the package to be consistent with the size, weight, and mailing characteristics    of packages containing narcotics proceeds and/or controlled substances.

16. On July 17, 2023, your affiant identified that the SUBJECT PARCEL had arrived at the Clendenin, West Virginia 25045 US Post Office. USPIS Task Force Officer (TFO) E.S. Johnson retrieved the SUBJECT PARCEL from the Clendenin, West Virginia 25045 US Post Office and transported it to the Charleston, West Virginia Processing and Distribution Center (PDC) Office. TFO Johnson noted, among other characteristics, that the SUBJECT PARCEL bore handwritten name and address information, a fictitious return address, cash paid postage of $112.20, no signature required, and was mailed from New York, a known source state for illicit drugs coming into the Southern District of West Virginia.

17. Your affiant made inquiries with CLEAR, an electronic database that has proven reliable in previous investigations in determining the legitimacy of name, address, and phone number information, regarding the return address of "William Rosenberg 164 Smith St Merrick N.Y 11566". CLEAR showed this name does not associate at that address. Furthermore, TFO Johnson conducted a search of USPS records regarding the address of 164 Smith St., Merrick, NY 11566.

The return address was determined to be an invalid mailing address. TFO Johnson also conducted a search regarding the destination address of "Jason Painter 161 Cromwell Estates Rd Clendenin, W.V 25045". CLEAR showed this name does not associate at that address.

18. Through other investigative techniques, including physical surveillance, TFO Johnson has identified a Chevrolet Cruze bearing West Virginia registration "O8V616" parked at 161 Cromwell Estates Road, Clendenin, West Virginia 25045. A West Virginia Division of Motor Vehicles (DMV) search of the West Virginia registration "O8V616" identified that the vehicle is registered to Jason Painter of 1821 B Roxalana Road, Dunbar, West Virginia 25064.

19. On July 17, 2023, TFO Johnson provided his trained narcotic detection dog, "Rex". Rex has experience with narcotics investigations including drug parcels and was last certified in April of 2023. The SUBJECT PARCEL was placed in a line-up with four (4) additional boxes of similar shapes and sizes. Rex conducted an exterior examination of all the parcels. Rex positively alerted on the SUBJECT PARCEL indicating the presence of the odor of controlled substances.

20. Based on the aforementioned factors and the narcotics K-9 alert, TFO Johnson obtained a federal search warrant (2:23-mj- 00130) for the SUBJECT PARCEL and opened the SUBJECT PARCEL on July 17, 2023. Upon opening the SUBJECT PARCEL, investigators identified several items to include children's art smocks, rainbow dot markers, watercolor paint brushes, colored pencils, Play-Doh, and a plastic pet food container. Upon removing the circular screw on lid from the plastic pet food container, investigators recovered five black vacuum sealed bags. Upon removing all the layers of wrappings from the five black vacuum sealed bags, investigators identified approximately 4,513.4 grams of white crystalline substance. Investigators then conducted a standardized field test on the white crystalline substance, and it produced a positive result for methamphetamine, a schedule II controlled substance.

9

21. On July 18, 2023, your affiant, and investigators with the USPIS, Metropolitan Drug Enforcement Network Team (MDENT), and U.S. Department of Homeland Security-Homeland Security Investigations (HSI), conducted a controlled delivery of the SUBJECT PARCEL to the residence of 161 Cromwell Estates Road, Clendenin, West Virginia 25045. During the controlled delivery, a postal inspector acting as an undercover letter carrier delivered the SUBJECT PARCEL to an individual later identified by his legal name (hereinafter referred to as "J.A.") at the residence at approximately 1:30pm. J.A. took the parcel inside the residence.

22. After the SUBJECT PARCEL was taken inside the residence, investigators executed a previously obtained federal anticipatory search warrant (2:23-mj-000132) and searched the residence. During the search of the residence, items consistent with methamphetamine distribution and sales were located. Also, during the execution of the search warrant, investigators conducted an interview with J.A. regarding the SUBJECT PARCEL and his/her involvement with the distribution of methamphetamine. J.A. advised he/she had little to do with the SUBJECT PARCELs contents as his/her partner, Jason Painter primarily dealt with the SUBJECT PARCEL contents.  However, J.A. stated he/she had coordinated via telephone SMS messages and facetime with a person named "Mitch" who he/she described as a black male subject, approximately thirty to forty years of age, with short dreads, from New York and was the source of the methamphetamine inside the SUBJECT PARCEL. J.A. advised that he/she was familiar with "Mitch" and had met him on numerous occasions at his/her residence regarding the distribution of methamphetamine. Investigators showed J.A. a New York driver's license photo of Brian E. Jones who was identified as the possible source of supply for the methamphetamine. J.A. advised he/she was not certain but believed that the photo he/she was shown was "Mitch" but with a different hair style. J.A. went on to advise that his/her partner, Jason Painter was the intended recipient of the

methamphetamine located inside the SUBJECT PARCEL and had previously sent approximately $1400 as payment for approximately 1 pound of methamphetamine from "Mitch". Investigators completed the execution of the search warrant and departed the area. Shortly after departing the area, TFO Johnson was contacted by J.A. who advised that "Mitch" and an unidentified black male subject had arrived at his/her residence to check on him/her and questioned him/her regarding why he/she was not answering his/her cell phone. J.A. advised TFO Johnson that "Mitch" stated he would come back later. J.A. advised TFO Johnson that "Mitch" and the other unidentified black male subject got into a newer model, silver/gray SUV with red seats, possibly an Audi, and departed the area.

23. After the completion of the execution of the search warrant at 161 Cromwell Estates Road, Clendenin, West Virginia 25045, TFO Johnson and Det. Jordan Hilbert conducted a consensual interview with Jason Painter in Charleston, West Virginia. During the interview, Jason Painter admitted his involvement with the SUBJECT PARCEL and with the distribution of methamphetamine. Jason Painter also described his communications with "Mitch" and provided a further description of him. Jason Painter also stated that "Mitch" has visited the Charleston, West Virginia area before regarding the methamphetamine he had supplied to Jason Painter to deliver to other individuals and often came with another unidentified black male. During the interview, Jason Painter advised that "Mitch" was currently in the Charleston, West Virginia area and has contacted him regarding the SUBJECT PARCEL. Jason Painter agreed to cooperate with investigators and to place controlled facetime calls and text messages to "Mitch" regarding the SUBJECT PARCEL and its contents. After several controlled text messages, "Mitch" requested Jason Painter to facetime him as soon as he arrived home and opened the SUBJECT PARCEL.

11

24. Investigators finally coordinated a controlled delivery of the SUBJECT PARCEL and its contents with "Mitch" via Jason Painter. During the coordination conversation with "Mitch" over several controlled text messages and facetime calls, "Mitch" discussed the packaging of the methamphetamine in detail and wanted to see the drugs via facetime as he was suspicious of the packaging due to the physical characteristics showed and/or described by Jason Painter. "Mitch" then requested that Jason Painter meet him at Wild Wileys bar located at 601 Short Street, South Charleston, West Virginia located adjacent to the Microtel Inn & Suites in South Charleston, West Virginia, and for Jason Painter to keep "two" (2) and bring the remaining contents. The remaining contents consisted of approximately eight (8) Ziploc bags which represents approximately eight (8) of the ten (10) pounds of methamphetamine shipped to Jason Painter's residence in the SUBJECT PARCEL. Jason Painter agreed to meet "Mitch" at the bar and deliver the methamphetamine. Following that conversation, "Mitch" contacted Jason Painter again and inquired as to what vehicle he was driving and where he was. Jason Painter advised he was driving his gray Nissan and was on his way. "Mitch" advised Jason Painter that he believed he was lying and that one of his neighbors said he was still home. Investigators believed with this information as well as identifying a Gray Mazda SUV displaying a New York registration in the area of Cromwell Estates Road, Clendenin, West Virginia that "Mitch" was near Jason Painter's residence. Upon identifying the Gray Mazda SUV displaying a New York registration occupied by two black male subjects, investigators stopped the vehicle and detained both subjects pending further investigation. Investigators later showed Jason Painter a photo of Brian E. Jones which was taken by investigators during the encounter. Jason Painter identified Brian E. Jones as "Mitch". Following the receipt of this confirmation, investigators arrested Brian E. Jones and Kshon Ricks, the two occupants of the Gray Mazda SUV. During the search incident to arrest of Kshon Ricks,

12

investigators located a hotel keycard and keycard holder for Room 358 at a Wyndham branded hotel.  Investigators know Microtel Inn to be a Wyndham branded hotel.

25. Investigators later searched the Gray Mazda SUV occupied by Kshon Ricks and Brian E. Jones. During the search, investigators located an iPhone still in navigation mode with the listed destination as the Microtel Inn located at 600 Second Avenue SW, South Charleston, West Virginia 25303. Investigators then traveled to the Microtel Inn & Suites at 600 Second Avenue SW, South Charleston, West Virginia 25303 on July 18, 2023 and spoke with hotel management. Hotel management advised they rented Room 358 to Kshon Ricks and another male subject. Hotel management stated that the two subjects checked in earlier in the day and were scheduled to check out on July 19, 2023.  Hotel management accompanied investigators to Room 358 and unlocked the door so that investigators could ensure no other persons were present inside Room 358 and that the room was secure in anticipation of a search warrant.  As soon as the door to Room 358 was opened, investigators detected a strong odor of marijuana emanating from the room.

26. Based upon your affiant's training and experience and conversations with other law enforcement officers, individuals involved in drug trafficking from out of state will utilize hotels as locations to store and/or facilitate their drug trafficking activities. Additionally, your affiant knows that individuals who are involved in drug trafficking and have indicia of hotel occupancy on their person often have personal items to include electronic devices, papers, receipts, and other items that could contain evidence of their drug trafficking activities.  Since Kshon Ricks and Brian E. Jones are from out-of-state and believed to be staying in the TARGET PREMISES during their time in West Virginia, your affiant believes that evidence of their illegal activities will be present in the TARGET PREMISES in the same way that drug traffickers maintain evidence of such activities in their residences.

## **CONCLUSION**

27. Based upon the foregoing, I submit the probable cause to believe that Room 358 of the Microtel Inn & Suites, 600 Second Avenue SW, Room 358, South Charleston, West Virginia 25303 (more fully described in "Attachment A") is a location that your affiant believes to play a significant role for the individuals both identified and not identified in the DTO between New York and the Southern District of West Virginia.  Your affiant believes that there is evidence of violations of 21 USC § 841(a)(1) and 21 USC § 843(b) at the Target Premises.

Respectfully submitted,

_____

BRANDON S. HOLESTINE
POSTAL INSPECTOR

On the ___19th___ day of July 2023, this affidavit was sworn to by the Affiant, who did no more than attest to its contents pursuant to Crim. R. 4.1 (b)(2)(A), by telephone after a document was transmitted by email, per Crim R. 4.1

_____

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE

14